UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RICHARD KELLY,<br><br>    Plaintiff,<br><br>    v.<br><br>PAUL TALBOT, M.D., HOUMAN KIANI, M.D.,<br>MIKE PERSON, DR. RAFIQ, NURSE<br>BEITLER, and NURSE PRACTITIONER<br>BRUBAKER,<br><br>    Defendants. | Case No. 1:15-cv-01529-TWP-TAB |

## ENTRY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment Dkt. [94], filed by the defendants Drs. Paul Talbot, Mike Person, Fakhry Rafiq, Licensed Practical Nurse Beitler ("LPN Beitler"), and Nurse Practitioner Brubaker[1] ("NP Brubaker") (collectively, "the Defendants"). Also pending is *pro se* Plaintiff Richard Kelly's ("Mr. Kelly") Motion to Clarify, Dkt. [108]. Mr. Kelly, an Indiana inmate, filed this action pursuant to 42 U.S.C. § 1983 alleging that Defendants have failed to treat his degenerative hip and spine damage and other medical conditions in violation of his Eighth Amendment rights under the U.S. Constitution. Generally, he asserts that the Defendants have not provided him adequate treatment for his nerve and arthritis pain and have not referred him to specialists as necessary. For the following reasons, the Motion for Summary Judgment, Dkt. [94], is **granted** and the Motion to Clarify, Dkt. [108], is **granted** to the extent that it was considered in ruling on summary judgment.

---

[1] The record reflects that the correct spelling of defendant Dr. Talbit's name is 'Talbot' and the correct spelling of Nurse Butler's name is 'Beitler'. The **Clerk shall amend** the docket to reflect the correct spellings.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490. Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001).

## II. FACTS

The following statement of undisputed material facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Mr. Kelly as the non-moving party. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

**A.** **Mr. Kelly's Condition**

Mr. Kelly has suffered serious pain in his back, leg, and hips for many years due to spine and nerve damage. In September 2007, the Neurology Specialty Clinic at Wishard Memorial

Hospital diagnosed him with mild peripheral neuropathy[2] and chronic L4 radiculopathy.[3] Peripheral neuropathy can have a small number of treatable causes and, in Mr. Kelly's case, these were considered and tested for and ruled out in 2008 and 2009.[4]

In November 2010, Mr. Kelly had a follow-up consultation. The specialist strongly suspected that Mr. Kelly was suffering from idiopathic peripheral neuropathy[5] or hereditary sensorimotor neuropathy.[6] In both cases, treatment of the symptoms is the only treatment course and these conditions cannot be reversed. A lumbar radiculopathy can have several causes and should be managed based on symptoms. Mr. Kelly also had a consultation in February 2011. The consultant recommended increasing Mr. Kelly's Ultram to up to 200mg twice a day and to continue Neurontin at the current dosage.

In July 2011, Mr. Kelly saw a neurosurgeon. According to Mr. Kelly, the surgeon suggested replacing Tramadol with Norco every four hours as a long-term treatment. The records state: "It would be appropriate per the facility physician to increase [Ultram] if necessary to

---

[2] Peripheral neuropathy is damage to peripheral nerves and often causes weakness, numbness and pain, usually in the hands and feet. Mayo Clinic, *Peripheral Neuropathy*, https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061 (last visited July 3, 2018).

[3] Radiculopathy is often caused by compression of a nerve root. Radiculopathy in the low back is also known as sciatica. Spine-health, *Radiculopathy, Radiculitis and Radicular Pain*, https://www.spine-health.com/conditions/spine-anatomy/radiculopathy-radiculitis-and-radicular-pain (last visited July 3, 2018).

[4] Kelly argues that specialist Dr. Runke, who he saw in February of 2011, intended to reverse his neuropathy. Her notes say: "I would like to continue to pursue any possible reversible causes for his neuropathy. If he does have some ongoing hyperglycemia, even if it is borderline, this could be contributing to his neuropathy progression."

[5] "Idiopathic" neuropathy has no identified cause. University of Chicago, Center for Peripheral Neuropathy, *Types of Peripheral Neuropathy – Idiopathic*, http://peripheralneuropathycenter.uchicago.edu/learnaboutpn/typesofpn/idiopathic/index.shtml (last visited July 3, 2018).

[6] Sensorimotor neuropathy is a condition that causes a decreased ability to move or feel because of nerve damage. MedlinePlus, *Sensiormotor polyneuropathy*, https://medlineplus.gov/ency/article/000750.htm (last visited July 3, 2018).

something like Norco 5/325 one to two tablets p.o. every four to six hours p.r.n. pain. I will leave that up to the discretion of the attending physician there." Dkt. [105]-1, at 53.

Additionally, Mr. Kelly's radiography tests reveal degenerative bone disease. On November 4, 2011, a lumbar MRI showed degenerative changes, and bony growth. On October 29, 2012, a cervical MRI demonstrated osteophytes[7] without significant nerve involvement.[8] Mr. Kelly's September 22, 2015 x-ray of his hips demonstrated minimal osteophyte formation with preserved joint spaces. "Bony degeneration" and "osteophytes" are terms associated with osteoarthritis, which is a progressive disease managed symptomatically with physical therapy, medications, weight management, surgery, and joint replacement, when available and appropriate.

In March 2013, Mr. Kelly had an MRI and evaluation by a neurologist. The neurologist was able to rule out multiple sclerosis, stroke, and tumor as causes of his symptoms. The neurologist determined that Mr. Kelly did not need further neurologic care and recommended a follow-up visit with an orthopedist. During the times relevant to Mr. Kelly's claims, he was incarcerated and treated at the Pendleton Correctional Facility ("Pendleton") and the New Castle Correctional Facility ("New Castle").

**B.** **Mr. Kelly's Medical Care at Pendleton (Dr. Person, Dr. Kiani, and Dr. Talbot)**

Mr. Kelly began seeing Dr. Person in February 2014. Mr. Kelly reported to Dr. Person that he had surgery on his lumbar spine in May 2011. Since the surgery, Mr. Kelly has experienced

---

[7] "Osteophytes is a term referring to bone spurs, smooth structures that form on the spine over a long period of time." Spine-health, *Osteophytes Definition*, https://www.spine-health.com/glossary/osteophytes (last visited July 3, 2018).

[8] Mr. Kelly asserts that his medical records have been altered regarding why he refused an EMG in December 2012. But whether or not Mr. Kelly refused an EMG at that time is not relevant to Dr. Morris's (???) opinion on the appropriateness of the care that the Defendants provided based on the information available to them at the time they treated him.

4

pain in both legs and weakness in his left leg.[9] His medications included Ultram, Baclofen, and Neurontin for his neuropathy pain. On March 17, 2014, Dr. Person evaluated Mr. Kelly to follow-up on his complaints of neuropathy pain. Mr. Kelly requested an upper and lower nerve conduction study ("NCS"). An NCS is used to determine the extent of nerve damage, if any. Dr. Person added Effexor XR to Mr. Kelly's medication regimen to see if it would help his nerve pain and requested an NCS of both the upper and lower extremities. On April 28, 2014, Dr. Person evaluated Mr. Kelly for his complaints of negative side effects from the Effexor XR. Dr. Person discontinued the Effexor XR at Mr. Kelly's request.

On June 2, 2014, Dr. Person met with Mr. Kelly to review the results of his nerve conduction studies. The studies confirmed that Mr. Kelly suffered from sensorimotor neuropathy in all four extremities. The recommendation from the study was an increase in his Neurontin dose.[10] Mr. Kelly requested OxyContin and Valium, instead of Ultram and Baclofen, but Dr. Person determined that there was no clinical reason to switch Mr. Kelly's medications because the Ultram and Baclofen were adequately managing his pain. However, Dr. Person did increase Mr. Kelly's Neurontin to 3600 mg per day as suggested.

Dr. Person met with Mr. Kelly on June 9, 2014 and June 16, 2014, regarding pain management. Mr. Kelly continued on Ultram and Baclofen for his complaints of neuropathy pain.

---

[9] Following the surgery, Mr. Kelly's neurosurgeon prescribed OxyContin and Valium. Dkt. [105]-1, at 48. Mr. Kelly states that these were not prescribed as temporary, but intended to be his long-term treatment, but the records state "Diazepam . . . prn spasm . . . oxycodone . . . prn pain." Dkt. [105]-1, at 48.

[10] Mr. Kelly asserts that Dr. Rocco, the neurologist, stated that he had never witnessed muscle spasms or such severity and that coupled with the EMG results, his doctors would definitely replace Tramadol and Baclofen with OxyContin and Valium. But these comments are not reflected in the medical records and are inadmissible hearsay. Fed. R. Evid. 802. He also argues that the Defendants are attempting to mislead the Court about the meaning and proper conclusions to take from these test results, but he has provided no admissible evidence to support his contentions.

On June 23, 2014, Dr. Person scheduled Mr. Kelly for a steroid injection for his complaints of back pain. On June 30, 2014, Dr. Person administered that steroid injection.

Dr. Person evaluated Mr. Kelly again on July 24, 2014. Mr. Kelly continued to complain of lower back pain and left upper quadrant pain. Dr. Person prescribed Methadone for Mr. Kelly's complaints of pain and discontinued his Ultram. On August 14, 2014, Mr. Kelly reported to Dr. Person that since the change to Methadone, he had a longer lasting level of some pain relief. On October 30, 2014, Mr. Kelly requested an increase in his Methadone dose because "it is not lasting long enough between doses." Dr. Person increased Mr. Kelly's Methadone dose from two 10 mg tabs once per day to two 10 mg tabs twice per day per his request.

On November 13, 2014, Mr. Kelly reported to Dr. Person that the high dose of Methadone had helped but complained about the timing of the doses. Other than prescribing the medication for twice a day, Dr. Person had no control as to when medications are passed out.

On December 4, 2014, Dr. Person met with Mr. Kelly for another round of steroid injections, but he rescheduled the steroid injections due to Mr. Kelly's complaints that he did not feel well. On December 18, 2014, Dr. Person evaluated Mr. Kelly and administered a steroid injection in his right and left hips for his complaints of hip joint pain due to calcific bursitis, which he was diagnosed with in 2005.

On March 12, 2015, Dr. Person evaluated Mr. Kelly for his complaints of back pain. Dr. Person increased Mr. Kelly's Methadone dose to 40 mg twice per day. On March 26, 2015, Mr. Kelly reported that the higher dose of Methadone was "helping".

On May 14, 2015, Mr. Kelly submitted a Request for Health Care expressing concern to Dr. Kiani that his Methadone prescription would be expiring in a couple of weeks and that Dr.

Person was leaving the prison. Mr. Kelly stated that he wanted to make sure Dr. Kiani was going to refill the Methadone order. Dr. Person responded explaining that the order was valid until June 12, 2015.

On May 28, 2015, Mr. Kelly submitted a Request for Health Care, asking for an increase in his Methadone dose. Mr. Kelly was already on 40 mg of Methadone twice per day, which was a significant dose. There was no clinical reason to increase Mr. Kelly's Methadone. Dr. Person had no further involvement in Mr. Kelly's medical care after June 2015.

On June 25, 2015, Dr. Kiani counseled Mr. Kelly on the need to taper off of Methadone, instructing that opioid pain medication is no longer the standard of care for chronic pain management. Dr. Kiani prescribed Clonidine, a non-opioid pain management alternative, to eventually replace the Methadone. On July 9, 2015, Dr. Kiani evaluated Mr. Kelly to follow up on his chronic back pain after he stopped taking Methadone. Mr. Kelly stated that he had taken the Clonidine with some relief and requested that the dose be increased. Mr. Kelly also continued to take Neurontin and Baclofen for back pain. Dr. Kiani observed that Mr. Kelly was able to walk well. Dr. Kiani had no further involvement in Mr. Kelly's medical care after July 10, 2015.

On July 16, 2015, Dr. Talbot evaluated Mr. Kelly for medication management because his prescriptions for Neurontin and Baclofen were due to be refilled. Mr. Kelly reported that he received a benefit from these medications. During this visit, Mr. Kelly inquired into whether Dr. Talbot would "renew" his former prescription for Methadone. Dr. Talbot saw no clinical indication for Methadone, as opioid pain medications are no longer the standard of care for chronic pain management. The rest of Mr. Kelly's examination was negative. Dr. Talbot made no changes to Mr. Kelly's medications.

On August 13, 2015, Dr. Talbot examined Mr. Kelly in the clinic. Mr. Kelly had multiple complaints and requested Tramadol, an opioid pain medication. Mr. Kelly's examinations were normal and Dr. Talbot determined that Tramadol was not clinically indicated because Mr. Kelly's pain was chronic. Dr. Talbot continued Mr. Kelly on Neurontin and Baclofen. On September 17, 2015, Dr. Talbot again evaluated Mr. Kelly for his pain complaints. Mr. Kelly reported that his low back pain was stable. He further reported that he had spontaneous movements of his calves and biceps with voluntary muscle spasms since 2005. Mr. Kelly reported that he had been diagnosed with bilateral hip disease in 2005. Dr. Talbot performed Patrick's Test, a physical examination used to determine the presence of joint dysfunction in patients with lower back pain. That test was negative. Dr. Talbot ordered x-rays of both hips. The x-rays were performed on September 22, 2015. The x-rays revealed that there was no acute osseous abnormality or significant degenerative change in either hip. On September 24, 2015, Dr. Talbot reviewed the x-ray results with Mr. Kelly. Dr. Talbot noted that Mr. Kelly's pain was not consistent with the minimal changes noted on the x-ray. Mr. Kelly admitted that he was "getting significant benefit from his Neurontin and Baclofen." The parties dispute whether Mr. Kelly was able to walk easily at that time, however the Court accepts Mr. Kelly's assertions.

During the October 29, 2015 visit, Mr. Kelly also asked for his Neurontin and Baclofen to be refilled for his chronic back and leg pain. Dr. Talbot noted that Mr. Kelly's neurological examination on August 13, 2015 was normal and that he did not observe a visible indication of change. Dr. Talbot also noted that the outside neurologist, who evaluated Mr. Kelly in 2013, determined that Mr. Kelly did not need to see a neurologist. Dr. Talbot's conclusion was that Mr. Kelly had failed back surgery syndrome, which is a general term used to describe the condition of

patients who have not had a successful result with back surgery and continue to have pain, and that the Tylenol Dr. Talbot prescribed for Mr. Kelly's scrotal pain would also be of benefit to Mr. Kelly's back and leg pain. Dr. Talbot planned to start weaning Mr. Kelly off of Neurontin and Baclofen. Dr. Talbot also referred Mr. Kelly to mental health addiction services.

On November 10, 2015, Dr. Talbot evaluated Mr. Kelly in the Chronic Care Clinic for hypertension, acid reflux, and chronic back pain. At that time, Mr. Kelly's back pain was managed with Neurontin and Baclofen. Dr. Talbot had no further involvement in Mr. Kelly's medical care after December 2, 2015.

**C.**     **Mr. Kelly's Medical Care at New Castle (LPN Beitler, Dr. Rafiq, NP Brubaker)**

On December 9, 2015, Mr. Kelly submitted a Request for Health Care asking to be seen for back pain and hip pain. In response, LPN Beitler notified Mr. Kelly that he was scheduled to see the provider for his complaints of pain. As a licensed practical nurse, LPN Beitler did not prescribe medication for patients and did not diagnose patients or determine what medical treatment was appropriate. LPN Beitler assessed the patient, relayed the information to the provider (*i.e.*, physician, physician's assistant, or nurse practitioner) and carried out the provider's orders regarding medication or treatment. LPN Beitler did not—and could not—prescribe medication for Mr. Kelly or make any diagnosis or decisions regarding what medical treatment Mr. Kelly needed. Only a provider can make decisions regarding medication, diagnoses, and treatment. Part of LPN Beitler's job duties at the prison was to review and respond to offenders' Request for Health Care forms. If the request was to see the provider for an objectively non-urgent issue, LPN Beitler would notify the patient that he had been referred to the provider.

On January 8, 2016, Dr. Rafiq renewed Mr. Kelly's Neurontin and Baclofen for his neuropathy and back pain. On February 4, 2016, Dr. Rafiq examined him based on his complaints of back pain. Dr. Rafiq noted that Mr. Kelly had tenderness in both hip joints and decreased range of motion. Dr. Rafiq continued Mr. Kelly on all of his other medications, including Neurontin and Baclofen.

On February 5, 2016, in response to his Requests for Health Care, LPN Beitler met with Mr. Kelly to discuss his concerns regarding his prescribed medications.

On February 18, 2016, Dr. Rafiq renewed Mr. Kelly's Neurontin and Baclofen prescriptions for 90 days. Dr. Rafiq had no further involvement in Mr. Kelly's medical care after February 18, 2016.

On March 6, 2016, Mr. Kelly submitted a Request for Health Care, specifically addressed to LPN Beitler, asking for an appointment with the provider because he believed that his prescriptions for Neurontin and Baclofen expired on March 20, 2016. In response, LPN Beitler notified him that his prescriptions would expire on May 18, 2016.

NP Brubaker evaluated Mr. Kelly once because of his complaints of testicular pain. Mr. Kelly also complained at that time of chronic back and hip pain. NP Brubaker ordered a bottom bunk/bottom range pass for six months due to Mr. Kelly's neuropathy. This is the only time NP Brubaker evaluated Mr. Kelly before he filed this lawsuit.

On April 4 and April 10, 2016, Mr. Kelly submitted Request for Health Care forms requesting to see the provider for chronic back pain. LPN Beitler responded to both of these forms notifying Mr. Kelly that he was scheduled to see the provider on April 13, 2016. LPN Beitler had no further involvement in Mr. Kelly's care after April 2016.

Mr. Kelly saw an outside neurologist in January 2018. That doctor's report states, among other things "maintain current medications." Dkt. [105]-1, at 15.[11]

D. **Opinion of Dr. Brian Morris, Rule 706 Expert**

Dr. Brian Morris ("Dr. Morris"), a neutral expert appointed by the Court, reviewed Mr. Kelly's medical records and provided an opinion of his treatment.[12]

Dr. Morris explains that appropriate treatment of peripheral neuropathy begins with effective evaluation of the problem and then initiation, monitoring, and titration of medication. Neurontin is often the cornerstone of treatment when the patient tolerates it. Other common considerations include tricyclic antidepressants. Many other medications have also been tried in with varying success, but there are no well-executed studies comparing the effectiveness of these drugs for this condition and it is therefore difficult for practitioners to make evidence-based decisions. Mr. Kelly had been tried on Effexor XR, Pamelor, and Depakene over the course of many years. According to Dr. Morris, the return to Neurontin in mid-2015 continued his positive clinical response to that treatment.

Dr. Morris opined that the appropriate ongoing treatment for Mr. Kelly's idiopathic peripheral neuropathy is maximizing medication therapy. He also states that, given Mr. Kelly's

---

[11] Mr. Kelly states that the doctor told him "he cannot understand why on earth any prison doctor would attempt to or stop prescribing tramadol or Methadone in light of all of the evidence that they already have and the known degree of pain caused by such and because said drugs are used for long term chronic care of said ailments." Dkt. [105], at 9. But this statement is inadmissible hearsay and contradicts the notation in the medical records.

[12] Mr. Kelly argues that Dr. Morris did not receive information from him before forming his opinion and that he did not review medical records for treatment he received before the Defendants treated him. But the parties notified the Court that they agreed on the medical records to be reviewed by the Rule 706 expert, stating, "The Rule 706 expert will review Mr. Kelly's medical records that relate to his EMGs, MRIs, laminectomy, and visits to neurological and orthopedic specialists from 2009 to the present. Additionally, the Rule 706 expert may review Mr. Kelly's medical records, including healthcare request forms, from 2014 through 2016." Dkt. [64].

response and tolerance of medication, it seems that Neurontin has been well tolerated and has been effective. Dr. Morris notes that he would consider providing Mr. Kelly with Neurontin three times per day instead of twice per day, but he explains that complete relief of neuropathic pain is unlikely to occur and that treatment goals are focused on his functional activities of life. Dr. Morris also explains that Mr. Kelly's nerve damage has not worsened due to treatment he has received. He states that the natural course of peripheral neuropathy is that of a slowly progressive disease even with optimal treatment. Dr. Morris explains that consultation with neurology specialists is necessary when symptoms are not responding to treatment as expected or there is a change in symptoms and the medical provider is uncertain how to evaluate or treat. In his Report, Dr. Morris notes that the Defendants considered Mr. Kelly's medical records and drew upon the evaluations of Dr. Katariwala, M.D. – Neurology (3/28/2013), and Dr. Rifai, M.D. – Neurosurgery (11/15/2012) to aid in his treatment. Dr. Rifai indicated that there is no indication for surgery of the cervical spine. Dr. Katariwala indicated that there was no follow-up needed for Neurology as "comprehensive neurological evaluation has ruled out any evidence of serious neurologic disease like Multiple Sclerosis." Dr. Morris concluded that in his opinion, the specialty evaluations that had been done and recommendations available to Mr. Kelly's care team were comprehensive and appropriate.

With regard to cervical, lumbar, and hip osteoarthritis, Dr. Morris explains that Mr. Kelly has had relatively recent surgical evaluations for his neck and lower back without recommendation for surgery, and from the clinical evaluation and x-ray of his hips, Dr. Morris does not believe that Mr. Kelly's hip arthritis caused the symptoms noted in September 2015, but additional evaluation may be necessary in the future.

12

Dr. Morris opined that Dr. Person's treatment of Mr. Kelly's pain with opioid medications is not generally recommended, but was accompanied by documentation of a response to that therapy and the treatment did not increase a risk to Mr. Kelly's health with regard to his peripheral neuropathy or osteoarthrosis. The shift from Methadone back to Neurontin was clinically appropriate and supported by previous neurology recommendations. In Dr. Morris's opinion, the medical care and treatment provided by Drs. Kiani and Talbot was appropriate and with consideration of Mr. Kelly's conditions.

## III. DISCUSSION

The Defendants move for summary judgment on Mr. Kelly's claims arguing that they were not deliberately indifferent to his serious medical needs. Because his claims are based on care he received as a convicted inmate, they are governed by the Eighth Amendment. Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

For purposes of summary judgment, the parties do not dispute that Mr. Kelly's conditions are serious. Rather, they disagree as to whether the Defendants were deliberately indifferent to Mr. Kelly's medical needs. "[C]onduct is 'deliberately indifferent' when the official has acted in

13

an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Freeman*, 394 F.3d 469, 478 (7th Cir. 2005) (quoting *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also McGee v. Adams*, 721 F.3d 474 481 (7th Cir. 2013); *Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In other words, "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* This means that medical personnel need not defer to a previous doctor's diagnosis or treatment plan; rather, they are free to make their "own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on . . . professional judgment and does not go against accepted professional standards." *Askew v. Davis*, 613 F. App'x 544, 547 (7th Cir. 2015) (quoting *Holloway v. Delaware Cnty. Sheriff,* 700 F.3d 1063, 1074 (7th Cir. 2012)) (citing *Norfleet v. Webster,* 439 F.3d 392, 393, 396–97 (7th Cir. 2006) (concluding that doctor was not deliberately

indifferent when he did not provide inmate with soft-soled shoes that had been provided at previous prison)). This also means that, while an inmate is he is entitled to reasonable measures to meet a substantial risk of serious harm, he is not entitled to specific care or even the best care possible. *Forbes v. Edgar,* 112 F.3d 262, 267 (7th Cir. 1997).

The treatment each Defendant provided to Mr. Kelly will be discussed in turn.

### A. **Dr. Person**

Dr. Person listened to Mr. Kelly's complaints and took them seriously. He reviewed Mr. Kelly's medical history and familiarized himself with Mr. Kelly's conditions. When Mr. Kelly requested nerve conduction studies, Dr. Person ordered them. When he continued to complain of neuropathy-associated pain, Dr. Person tried alternative medications, such as Effexor XR. When the results of the nerve conduction study included a recommendation for an increase in Mr. Kelly's Neurontin dose, Dr. Person increased the dose. When Mr. Kelly complained of continued pain in his hips, Dr. Person administered steroid injections. Dr. Person also prescribed Methadone and increased the dose when Mr. Kelly continued to complain of pain. Dr. Morris, the Court-appointed expert, reviewed the care that Dr. Person provided and concluded that although "opioid management for chronic pain from either peripheral neuropathy or osteoarthritis is generally not recommended. Dr. Person's choice of treatment was accompanied by documentation of response to therapy. The treatment management pursued did not increase risk to Mr. Kelly's health from either the peripheral neuropathy or osteoarthritis."

Mr. Kelly argues that Dr. Person was aware that the treatment provided to him was not working, but continued that treatment anyway. But the evidence reveals that Dr. Person considered each of Mr. Kelly's complaints and attempted to treat them. He ordered studies and tried different

medications, discontinued medication when Mr. Kelly complained of side effects, and increased his dose of Neurontin. Mr. Kelly's arguments that Dr. Person ignored his complaints and failed to treat him are not supported by the record. Dr. Morris opined that the treatment Dr. Person provided "did not increase risk to Mr. Kelly's health from either the peripheral neuropathy or osteoarthritis." While Mr. Kelly disagrees with the treatment Dr. Person provided, he has not shown that Dr. Person failed to do anything to prevent the harm, *Board*, 394 F.3d. at 478, or that "no minimally competent professional would have [done the same] under those circumstances." *Pyles*, 771 F.3d at 409. Dr. Person is therefore entitled to summary judgment on Mr. Kelly's claims.

**B.      Dr. Kiani**

Dr. Kiani saw Mr. Kelly in June and July 2015. During that time, Mr. Kelly continued to receive Neurontin, Baclofen, and Methadone for his pain. Believing that opioid pain medications are not the standard of care for chronic pain management, Dr. Kiani counseled Mr. Kelly on the need to taper off of Methadone. Dr. Kiani prescribed Clonidine as a non-opioid alternative.

Mr. Kelly states that Dr. Kiani told him that he would not be responsible for prescribing narcotics to prisoners regardless of their medical history or degree of pain. According to Mr. Kelly, this shows that Dr. Kiani stopped his prescription for Methadone for non-medical reasons and did not replace it with anything that provided relief. Dkt. [105], at 18. But the record indicates, and Dr. Morris has opined, that the treatment that Dr. Kiani provided to Mr. Kelly was appropriate. Dr. Kiani considered Mr. Kelly's complaints of pain and considered the possible negative impacts of long-term opioid use and determined a treatment regimen he believed would be appropriate. This conclusion is supported by Dr. Morris's expert opinion that opioids are not appropriate for chronic pain treatment. Mr. Kelly's contention that Dr. Kiani told him he would not prescribe

opioids does not support a conclusion that Dr. Kiani's decision was not based on medical judgment. *See, e.g.*, *McGee*, 721 F.3d at 481; *see Holloway*, 700 F.3d at 1073 (7th Cir. 2012) ("[The plaintiff] did not present any evidence to show that [the doctor's] decision not to prescribe Oxycontin was a substantial departure from accepted professional standards.").

To the extent that Mr. Kelly argues that other doctors prescribed him opioids or told him that his doctors should prescribe them, Mr. Kelly has failed to present admissible evidence to support these arguments. Even if he had, these differences in treatment strategy do not show that Dr. Kiani was deliberately indifferent to Mr. Kelly's pain. *See Pyles*, 771 F.3d at 409 ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation."). In addition, the fact that Dr. Kiani prescribed Clonidine to replace Methadone, supports a conclusion that Dr. Kiani continued to attempt to treat Mr. Kelly's pain while tapering him off of Methadone.

In short, the evidence in the record does not support a conclusion that Dr. Kiani ignored a substantial risk of harm to Mr. Kelly. Accordingly, Dr. Kiani is entitled to summary judgment on Mr. Kelly's claims.

## C. **Dr. Talbot**

Dr. Talbot treated Mr. Kelly for approximately four months. During that time, he evaluated Mr. Kelly nine times. The first time he saw Dr. Talbot, Mr. Kelly asked him to prescribe Methadone. Based on his examination of Mr. Kelly and his conclusion that opioid medications are not the standard of care for long-term chronic pain management, Dr. Talbot saw no indication for the prescription of Methadone. On his next visit, Mr. Kelly asked Dr. Talbot to prescribe

Tramadol, another opioid medication. Because Mr. Kelly's examination was normal and his pain was chronic, Dr. Talbot did not believe this was indicated. When Mr. Kelly complained of pain in his hips and back, Dr. Talbot performed a test to assess these complaints. The test was negative. Thereafter, Dr. Talbot ordered x-rays, which revealed mild arthritis.

Mr. Kelly argues that Dr. Talbot ignored his complaints and refused to send him to a specialist. But the records reflect that Dr. Talbot considered his complaints, ordered tests, and provided him care. While Mr. Kelly argues that Dr. Talbot should have sent him to a specialist, Dr. Morris opined that evaluation by a specialist was not necessary at that time. Further, Dr. Morris opined that persistent pain accompanies both neuropathy and osteoarthritis. Thus, Mr. Kelly's persistent pain, although unfortunate, does not mean that Dr. Talbot failed to provide him with appropriate care. There is no evidence that Dr. Talbot ignored Mr. Kelly's complaints or that his care was outside of the range of acceptable professional standards. Dr. Talbot is therefore entitled to summary judgment on Mr. Kelly's claims.

**D.** **LPN Beitler**

LPN Beitler's job was to assess Mr. Kelly, convey information to the provider, and follow the provider's orders. LPN Beitler evaluated Mr. Kelly on several occasions and relayed his findings to the provider for orders or referred Mr. Kelly to the provider for evaluation. There is no evidence that LPN Beitler ignored any of Mr. Kelly's complaints or provided care to him that was outside the range of professional judgment. LPN Beitler is therefore entitled to summary judgment on Mr. Kelly's claims.

**E. Dr. Rafiq**

Dr. Rafiq saw Mr. Kelly only a few times. He maintained his current medications for his neuropathy and back pain. In addition, when Mr. Kelly continued to complain of back pain, Dr. Rafiq examined him and continued his pain medication. Mr. Kelly argues that he informed Dr. Rafiq of his suffering and that Dr. Rafiq refused to provide him with care or refer him to a specialist. Again, Dr. Morris opined that referral to a specialist was not necessary at that time and that unfortunately, persistent pain is normal with Mr. Kelly's conditions. Dr. Rafiq is therefore entitled to summary judgment on Mr. Kelly's claims.

**F. NP Brubaker**

NP Brubaker saw Mr. Kelly once before he filed this lawsuit. She ordered a bottom bunk pass for him based on his complaints of back pain. Mr. Kelly argues that NP Brubaker ignored his complaints and refused to send him to a specialist. But NP Brubaker's failure to provide him exactly the care he wanted is not sufficient to show that she was deliberately indifferent to his medical needs. Accordingly, NP Brubaker is entitled to summary judgment on Mr. Kelly's claims.

## IV. CONCLUSION

The Court does not doubt and that record is clear, that Mr. Kelly suffers from conditions which unfortunately cause him chronic pain. However, there is no evidence suggesting that the Defendants failed to exercise medical judgment or responded inappropriately to Mr. Kelly's ailments. For the foregoing reasons, the Defendants' Motion for Summary Judgment, Dkt. [94], is **GRANTED**. Mr. Kelly's Motion to Clarify, Dkt. [108], is **GRANTED** to the extent that the Motion to Clarify was considered in ruling on the Motion for Summary Judgment.

Judgment consistent with this Entry shall now issue.

**SO ORDERED.**

Date: 7/9/2018

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Richard Kelly, #860033
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
New Castle, Indiana 47362

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com